Rivera Román, Juez Ponente
*1133 TEXTO COMPLETO DE LA RESOLUCIÓN
El Municipio de Vega Baja (Municipio) presentó un recurso de apelación ante este foro apelativo. La intención del recurso es que se revise la sentencia emitida por el Tribunal de Primera Instancia a favor de Pfizer Pharmaceuticals, Inc. (PPI) y Pfizer Pharmaceuticals Limited (PPL).
Las controversias que debemos atender son las siguientes: (1) ¿Si los ingresos por intereses producto de unos préstamos realizados por PPI y PPL a su matriz Pfizer Inc. y a una entidad de Dublin, Irlanda, deben ser consideradas como ingreso de fomento industrial por lo que no están sujetos al pago total (100%) de patentes municipales? De tener razón, las corporaciones responderán sólo por un 40%. (2) ¿Si el Municipio puede imponer patentes municipales a PPL sobre la cantidad recibida en calidad de un reembolso de gastos de mercadeo adelantados a su compañía afiliada?; (3) ¿Si procedía que el Municipio le impusiera penalidades a PPI y PPL por no someter, junto con su Declaración de Volumen de Negocios, los estados financieros auditados que requieren la Ley de Patentes Municipales? Veamos los hechos del caso.
I
PPI es una corporación organizada y existente bajo las leyes del Estado de Delaware y autorizada por el Departamento de Estado de Puerto Rico a realizar negocios en Puerto Rico. Por su parte, PPL es una corporación organizada y existente bajo las leyes de las Islas Caimanes, y autorizada por el Departamento de Estado para realizar negocios en Puerto Rico. Ambas compañías realizan operaciones de manufactura de productos farmacéuticos y tienen oficinas en el Municipio.
PPI y PPL son subsidiarias de Pfizer, Inc. y ésta, a su vez, es la corporación matriz organizada bajo las leyes estatales de Delaware. Pfizer no se dedica a la industria o negocio en Puerto Rico. Sin embargo, mantiene operaciones farmacéuticas multinacionales a través de sus subsidiarias.
Tanto PPI como PPL son concesionarias y tenedoras de dos decretos de exención contributiva industrial (Decreto) otorgados bajo las disposiciones de la Ley 135 de 2 de diciembre del 1997, según enmendada, conocida como Ley de Incentivos Contributivos del 1998. Durante los años en controversia, ambas subsidiarias recibieron el pago de intereses por concepto de préstamos realizados a su compañía matriz Pfizer. También recibieron el pago por intereses provenientes de un préstamo realizado a una entidad de Dublin, Irlanda, la cual tampoco está dedicada a industria o negocio en Puerto Rico. El pago por concepto de intereses fue incluido como ingreso de fomento industrial en las correspondientes Declaraciones de Volumen de Negocios, por constituir ingresos de fuentes de fuera de Puerto Rico.
En el 2001, PPL aportó aúna afiliada $80,167,444 para cubrir los gastos estimados en el mercadeo de algunos de sus productos. Esta cantidad no fue deducida del volumen del negocio de PPL para dicho año. La afiliada le reembolsó a PPL $43,831,465 porque la cantidad aportada para el mercadeo de los productos excedió lo que efectivamente se utilizó. PPL incluyó el reembolso ($43,831.465) como ingreso en su Declaración de Volumen de Negocio correspondiente al año 2002-2003 y pagó patente sobre la misma. El pago de patente municipal en exceso realizado por PPL ascendió a la cantidad de $90,850.68. El 8 de enero de 2004, PPL le solicitó a la Directora de Finanzas del Municipio un reintegro o crédito por la patente municipal pagada por el reembolso. PPL entendía que el reembolso no debió haberse incluido al calcularse la patente municipal para el año 2002-2003.
Durante los años fiscales 1999-2000, 2000-2001 y 2001-2002, ambas corporaciones, PPL y PPI, pagaron a tiempo sus patentes municipales y sometieron sus declaraciones de volumen de negocio conjuntamente con los estados financieros auditados. Sin embargo, en el año fiscal 2002-2003 efectuaron el pago de patente municipal y *1134 sometieron la declaración del volumen de negocio, pero no entregaron los estados financieros auditados. El 22 de abril de 2002, PPI y PPL solicitaron prórrogas para rendir sus respectivas Declaraciones de Volumen de Negocios (2002-2003). El Municipio le concedió a ambas corporaciones una prórroga, por el término máximo que dispone la Ley, de seis meses hasta el 23 de octubre de 2002. En esa misma fecha, PPI y PPL realizaron el pago de las patentes por la suma total de $4,431,000. El 21 de octubre de 2002, sometieron las Declaraciones, pero no acompañaron los Estados Financieros Auditados.
Se invocó, como justificación para el atraso, la compleja adquisición de la corporación Warner-Lamber y su posterior fusión con PPI. Esto provocó que los estados financieros de PPI y PPL no estuvieran disponibles a tiempo y fueron terminados, respectivamente, el 30 de septiembre de 2001 y el 30 de noviembre de 2001. El 13 de diciembre de 2003, la Directora de Finanzas del Municipio le impuso una penalidad de $1,088,855.70 a PPL y de $233,566.41 a PPI por no incluir los estados financieros auditados. PPL obtuvo de sus auditores externos, KPMG Peat Marwick, los estados financieros auditados el 16 de diciembre de 2002 y los sometió al Municipio el 18 de diciembre de 2002. Mientras, PPI los consiguió el 20 de diciembre de 2002 y los entregó al Municipio ese mismo día.
El Municipio le notificó a PPI, el 11 de diciembre de 2002, deficiencias preliminares para los años fiscales 1999-2000, 2000-2001, 2001-2002 y 2002-2003 y a PPL una deficiencia preliminar para el año 2002-2003. Ambas compañías solicitaron reconsideración y vista administrativa. Ésta se celebró el 9 de abril de 2003. El 20 de agosto de 2003, el Municipio le notificó a PPI que sus deficiencias finales, en los respectivos años, ascendían a $1,515,789.83 y a PPL que su deficiencia final era de $1,511,426.73; en ambos casos incluían intereses y penalidades. PPI presentó una fianza de $1,652,210.92 y PPL una de $1,647,455.14, ante la Directora de Finanzas del Municipio, el 17 de septiembre de 2003.
Las compañías PPI y PPL presentaron una demanda contra el Municipio el 10 de octubre de 2003. Esto, para impugnar las notificaciones de deficiencias contributivas en las patentes municipales, ascendentes a $1,515,789.83 y $1,511,426.73 (incluían las penalidades administrativas de $233,566.41 y $1,088,855.70), y reclamar un crédito de $90,850.68 a un reembolso tributado erróneamente. El Municipio contestó la demanda el 25 de noviembre de 2003.
El 24 de mayo de 2005, las partes sometieron un Informe sobre Conferencia Preliminar Entre Abogados. El 5 de diciembre de 2005, el Municipio formuló dos solicitudes de sentencia sumaria parcial: (1) para que se mantuvieran las penalidades, y (2) para que se sostuviera que los ingresos por intereses de unos préstamos realizados por PPI y PPL a ciertas afiliadas localizadas fuera de Puerto Rico, estaban sujetos al pago total de patentes municipales porque no cualificaban como Ingreso de Fomento Industrial, bajo la Ley de Incentivos Contributivos de Puerto Rico. PPI y PPL se opusieron a que se dictara sentencia sumaria a favor del Municipio, por lo que solicitaron sentencia sumaria a su favor.
El tribunal de instancia determinó no dictar sentencia sumaria. El juicio en su fondo se celebró los días 13, 14, 15, 16 de marzo de 2006. El Tribunal de Primera Instancia dictó sentencia mediante la cual dejó sin efecto las notificaciones de deficiencias y reconoció un crédito a favor de PPL por la partida de reembolso erróneamente tributada, ascendente a $90,850.68, el 6 de julio de 2006. Esta sentencia fue notificada el 13 de julio de 2006
El Municipio presentó una Moción Solicitando Determinaciones de Hechos Adicionales y Relación de Evidencia Documental el 24 de julio de 2006. Posteriormente, el Tribunal de Instancia declaró No Ha Lugar a la Moción. Esta orden fue notificada el 18 de agosto de 2006. Contra tal dictamen, el Municipio recurrió ante el Tribunal de Apelaciones el 16 de octubre de 2006. Específicamente, el Municipio planteó que el Tribunal de Primera Instancia erró en las siguientes apreciaciones: (1) los ingresos de intereses por concepto de préstamos otorgados a una compañía que no tiene negocios en Puerto Rico, sólo tributan en un 40% porque constituyen ingresos de fuentes fuera de Puerto Rico; (2) una penalidad impuesta a PPI y PPL por no haber radicado los *1135 Estados Financieros Auditados debe ser atendida por el Tribunal mediante revisión administrativa y nó en un juicio de novo, por lo que las compañías no podían plantear, por primera vez, la reorganización y posterior fusión de Warner Lambert, Co. y PPI como justa causa para tal incumplimiento; (3) se utilizó en las determinaciones de hechos y conclusiones de derecho de la sentencia, emitida por el foro de instancia, el contenido de dos declaraciones juradas que no fueron admitidas en evidencia; (4) se admitieron en evidencia, como prueba de un alegado reembolso, dos documentos titulados "Intercompany Credit Invoice", a pesar de que éstos: (a) no fueron autenticados, (b) no expresan el concepto por el que se emitieron, (c) no establecen reembolso alguno, (d) constituyen prueba de referencia inadmisible, y (e) su admisibilidad fue oportunamente objetada; (5) que PPL recibió un reembolso de $43,831,435 por concepto de una aportación de $80,167,444 y que no procede imponer el pago de patentes municipales a un reembolso. Teniendo el beneficio de la comparecencia de ambas partes, procedemos a resolver.
II
A. La interpretación de las leyes contributivas
La Asamblea Legislativa de Puerto Rico tiene la encomienda constitucional de crear aquella normativa estatutaria necesaria para el desarrollo económico, social, cultural, académico y político del país. Por eso, el Poder Legislativo, al elaborar una legislación, tiene en mente conferirle finalidad a un propósito congruente con el bienestar de la sociedad puertorriqueña. Esto implica que toda ley está cimentada en un objetivo que puede resultar en: (1) la alteración de una situación existente; (2) el complemento de una reglamentación vigente; (2) reconocer o proteger un derecho; (3) crear una política pública; (4) fomentar el bienestar general; y (5) formular un plan de gobierno. R.E. Bernier y J.A. Cuevas Segarra, Aprobación e Interpretación de Leyes en Puerto Rico, Segunda Edición Revisada, Publicaciones J.T.S., 1987, Vol. 1, págs. 245-246. Esa intención es la que la Rama Judicial debe identificar e interpretar, de forma que se pueda cumplir a través de la determinación judicial.
Los tribunales tienen el deber de interpretar las leyes para que se alcancen los propósitos para los cuales fueron aprobadas. En ese proceso interpretativo, se deben considerar la naturaleza del problema o necesidad que se pretendía atender a través de la legislación y determinar los motivos que dieron base a su aprobación. Dorante v. Wrangler of P.R., 145 D.P.R. 408, 417 (1998); Chase Manhatan Bank v. Municipio de San Juan, 126 D.P.R. 759, 766 (1990). Esta gestión judicial de buscar las razones legislativas para aprobar un estatuto es lo que, en el argot jurídico legal, se conoce como la intención legislativa. Vázquez, v. ARPE, 128 D.P.R. 513, 523-524 (1991).
La intención del legislador es importante y se debe auscultar, averiguar y precisar, particularmente cuando existe alguna ambigüedad o cuando la interpretación literal dé la letra de la ley resulta en un resultado contrario al propósito legislativo. R. E. Bernier y J. A. Cuevas Segarra, supra, pág. 242. En este sentido, se debe rechazar una interpretación literal y forzada del texto legal que conduzca a un resultado contrario al que perseguía el legislador. Pueblo v. Seda, 82 D.P.R. 719, 725 (1961).
Se han elaborado ciertos principios de hermenéutica, fundamentados en la norma básica de la primacía de la intención legislativa, para facilitar la resolución de ambigüedades o dudas en la interpretación de ciertos tipos de leyes. El pertinente a este caso es el que señala que para interpretar correctamente una ley es necesario estudiarla y analizarla como un todo. Es peligroso realizar una lectura aislada y desconectada de porciones de una ley porque podría dar lugar a equivocación o confusión. Sobre este particular, el Tribunal Supremo de Puerto Rico ha sido enfático al establecer que para acceder al verdadero sentido de una disposición hay que leerla y considerarla en el contexto de la totalidad de la legislación de la cual es parte. Delgado v. D.S.C.A., 114 D.P.R. 177, 182 (1983). Lo contrario sería enajenarse del verdadero sentido y propósito de la normativa estatutaria.
Existen diferentes tipos de estatutos que se interpretan distintamente de acuerdo a la razón por la cual fueron creados. Si el objetivo legislativo que se persigue es beneficioso para los ciudadanos o el Estado, la interpretación deberá ser liberal. Por el contrario, si el objetivo podría ser desfavorable para el gobierno o la sociedad en general, la interpretación debe ser restrictiva.
*1136 En el caso ante nuestra consideración es necesario afrontar varias interrogantes. ¿Cómo deben los tribunales interpretar la legislación contributiva del gobierno central y municipal? ¿Será de manera liberal o restrictiva?
El ente gubernamental estatal tiene la responsabilidad principal de definir y establecer la política pública económica y fiscal del país. Los estatutos contributivos son el vehículo práctico para otorgarle viabilidad a esa política pública fiscal del Estado. En ese sentido, su definición de la estructura tributaria no puede realizarse en forma desconectada y aislada de la apreciación y opinión de los gobiernos municipales. Cualquier intento de reestructuración tributaria que se realice en Puerto Rico debe tomar en consideración la Reforma Municipal que se implantó con la Ley de Municipios Autónomos y otras leyes relacionadas como la Ley de Patentes Municipales. Gobierno de Puerto Rico, Departamento de Hacienda; Suplan Andie y Ramón J. Cao García, editores; Reforma Contributiva en Puerto Rico-1994: Estudio Técnico, Editorial de la Universidad de Puerto Rico, 1996, pág. 431. Esto para que no se suscite inconsistencia en la normativa contributiva del país, ya que los municipios tienen también la responsabilidad de imponer contribuciones tanto a los individuos como a las corporaciones.
La Ley de Municipios Autónomos, Ley 81 del 30 de agosto del 1991, le confirió a los municipios un mayor grado de autonomía fiscal y de gobierno propio para atender las necesidades de sus habitantes. De esta forma, se posibilitó la llamada Reforma Municipal que procuraba que los municipios tuvieran una participación más activa en la planificación urbana y económica de su jurisdicción. Específicamente, la normativa legal establece que:
"(a) Se reconoce la autonomía de todo municipio en el orden jurídico, económico y administrativo. Su autonomía está subordinada y será ejercida de acuerdo a la Constitución del Estado Libre Asociado y de esta ley. La autonomía municipal comprenderá esencialmente la elección de las autoridades locales por el voto directo de los electores calificados del municipio, la libre administración de sus bienes y de los asuntos de su competencia o jurisdicción y la disposición de sus ingresos y de la forma de recaudarlos e invertirlos." Art. 1.006, inciso (a), Ley 81 del 30 de agosto del 1991, según enmendada, conocida como Ley de Municipios Autónomos; 21 L.P.R.A. see. 4004 (a).
Esta Reforma Municipal modificó fundamentalmente la fórmula de financiamiento de los municipios, principalmente mediante la legislación de cambios en las leyes de contribución sobre la propiedad y patentes municipales. Respecto a la Ley de Patentes Municipales, Ley 113 del 10 de julio del 1974, según enmendada, ésta responde a una filosofía que favorece la ampliación del poder fiscal de los municipios, de forma que éstos puedan proveer más servicios directos a la ciudadanía. F.D.I.C. v. Municipio de San Juan, 134 D.P.R. 385, 392 (1993). Esta facultad y potestad contributiva de los gobiernos municipales ha continuado fortaleciéndose a través de las enmiendas a la Ley de Patentes Municipales. Molinos de P.R. v. Municipio de Guaynabo, 105 D.P.R. 470, 474 (1976).
La disposición histórica legislativa de fortalecer, antes que debilitar, la facultad contributiva de los gobiernos municipales promueve que se interprete de forma liberal la facultad impositiva de los municipios concedida en la Ley de Patentes Municipales. First Bank de P.R. v. Municipio de Aguadilla, 153 D.P.R. 198, 204 (2001); Molinos de P. R. v. Municipio de Guaynabo, supra, pág. 474. Esta apreciación es cónsona con la Ley de Municipios Autónomos que dispone lo siguiente: "los poderes y facultades conferidos a los municipios por esta Ley o cualquier otra, excepto disposición en contrario, se interpretará liberalmente, en armonía con la buena práctica de política pública fiscal y administrativa, de forma tal que siempre se propicie el desarrollo e implantación de la política pública enunciada en esta Ley de garantizar a los municipios las facultades necesarias en el orden jurídico, fiscal y administrativo para atender eficazmente las necesidades y el bienestar de sus habitantes". Art. 1.004, supra; 21 L.P.R.A. sec. 4002.
El análisis interpretativo de la normativa contributiva estatal difiere del que se ha establecido al evaluar la legislación contributiva municipal. A través de los años, así lo ha enfatizado el Tribunal Supremo de Puerto Rico *1137 al indicar que los estatutos contributivos estatales deben ser interpretados restrictivamente. Concretamente, el foro de última instancia ha expuesto que un tribunal no debe interpretar la legislación contributiva en forma extensiva, sino que debe interpretarla en forma justa a tenor con sus propios y expresos términos. Continental Ins. Co. v. Srio. de Hacienda, 154 D.P.R. 146, 157-158 (2001); Tallcott Inter-American Corp. v. Registrador, 104 D.P.R. 254, 262 (1975). Esta regla de interpretación estricta de las exenciones contributivas se fundamenta en que éstas son "verdaderas derogaciones del poder soberano" y por esa razón no pueden extenderse más allá de los términos expresos y exactos del estatuto que las otorga. Cía Ferroviaria v. Srio de Hacienda, 80 D.P.R. 524, 534 (1958). En ese sentido, tampoco se puede interpretar una ley contributiva de manera que facilite la evasión del pago de contribuciones que la Asamblea Legislativa ha intentado imponer. West India Oil Co. (P.R.) v. Sancho Bonet, Tes., 54 D.P.R. 732, 744-745 (1939).
Las exenciones contributivas son privilegios excepcionales que concede el Estado y toda duda sobre su existencia debe resolverse en su contra. Café Rico, Inc. v. Mun. de Mayagüez, 155 D.P.R. 548, 559-560 (2001). Estas deben concretamente existir; no pueden ser inferidas. Rivera v. Registrador, 74 D.P.R. 127, 143 (1952). Tampoco pueden ser creadas mediante la eliminación del lenguaje claro del estatuto. Pujals & Bros. v. Srio de Hacienda, 89 D.P.R. 263, 267 (1963). Además, sólo pueden ser reclamadas por la persona o entidad claramente comprendida en los términos descriptivos del estatuto que los crea. Berwind Lines Inc. v. Srio. de Hacienda, 113 D.P.R. 658, 660(1982).
B. La apreciación de la prueba
Para que el Tribunal pueda cumplir cabalmente con su función revisora, la parte apelante tiene que presentar una transcripción, el resumen de prueba oral o una exposición narrativa cuando se señala en su recurso de apelación algún error relacionado con la suficiencia de la prueba testifical o con la apreciación de la prueba por parte del Tribunal de Primera Instancia. Regla 19, inciso a, del Reglamento del Tribunal de Apelaciones, 4 A L.P. R.A. Ap. XXII-B; Regla 54.2 y 54.3, de las de Procedimiento Civil, 32 L.P.R.A. Ap. III; Álvarez de Choudens et als. v. Rivera, 2005 J.T.S. 90, 165 D.P.R._(2005); Rivera v. Pan Pepín, Inc., 2004 J.T.S. 68, 161 D.P.R._(2004).
Los Tribunales Apelativos no deben intervenir con la apreciación de la prueba que realiza el Tribunal de Instancia en ausencia de pasión, prejuicio, error manifiesto o parcialidad. Rodriguez v. Urban Brands, 2006 J.T.S. 65, 167 D.P.R._(2006); McConnell v. Palau, 2004 J.T.S. 73, 161 D.P.R._(2004); Ortiz v. Cruz Pabón, 103 D.P.R. 939, 946 (1975). Se presume que el T.P.I. actuó correctamente y corresponde al peticionario demostrar lo contrario. Morán Ríos v. Martí, 2005 J.T.S. 116, 165 D.P.R. _(2005); Pueblo v. Prieto Maysonet, 103 D.P.R. 102, 107(1974).
Un foro apelativo no puede descartar y sustituir por sus propias apreciaciones las determinaciones tajantes y ponderadas del foro de instancia a base de un examen del expediente del caso. Rolón v. Charlie Car Rental, Inc., 148 D.P.R. 420, 433 (1999). Esto porque los juzgadores de primera instancia se encuentran en mejor posición de aquilatar la prueba testifical, observar el comportamiento de los testigos mientras declaran y adjudicar la credibilidad que merezcan. Arguello v. Arguello, 155 D.P.R. 62, 79 (2001); Orta v. Padilla, 137 D.P.R. 927, 937 (1995); Monllor v. Soc. Legal de Gananciales, 138 D.P.R. 600, 610 (1995).
III
C. El análisis de la legislación contributiva y los decretos
La Ley de Municipios Autónomos es la Ley Orgánica de los municipios y es representativa de los cimientos de la Reforma Municipal. Esta provocó un cambio trascendental y significativo en la administración, organización y funcionamiento del régimen municipal en Puerto Rico. No tan sólo posibilitó el que los municipios tuvieran una reforma administrativa, sino que también les delegó expresamente su autonomía fiscal.
*1138 Uno de los aspectos importantes de la Reforma Municipal es la autonomía fiscal. Para lograr efectivamente que los municipios iniciaran el proceso para adquirir su autonomía fiscal, se aprobaron o enmendaron tres leyes dirigidas a reducir la dependencia de los municipios en el gobierno central, así como para efectuar cambios significativos en las fuentes de ingresos municipales. Una de las leyes que fue enmendada, y que es pertinente al caso, es la Ley de Patentes Municipales, Ley 113 del 10 de julio del 1974, según enmendada. El propósito de enmendar esta legislación contributiva era convertirla en una herramienta más eficaz para producirle mayores recursos económicos a los municipios. Sus enmiendas principales estuvieron dirigidas a: (1) ampliar los topes máximos para cada municipio y flexibilizar su imposición para incentivar el desarrollo social y económico de la comunidad; y (2) agilizar el cobro de las deficiencias en el pago. Leonardo Santana Rabell y Mariano Negrón Portillo, Editores, La Reforma Municipal en Puerto Rico: Retos y Oportunidades, Segunda Edición Revisada, Escuela Graduada de Administración Pública, Universidad de Puerto Rico, Puerto Rico, 1995, pág. 69.
La Constitución del Estado Libre Asociado establece que la facultad de imponer contribuciones radica exclusivamente en la Asamblea Legislativa. Sin embargo, también clarifica que el Poder Legislativo puede autorizar a los municipios la imposición de contribuciones, mediante legislación. Concretamente, la Constitución expone que el poder del Estado Libre Asociado para imponer y cobrar contribuciones y autorizar su imposición y cobro por los municipios, se ejercerá según se disponga por la Asamblea Legislativa y nunca será rendido o suspendido. Art. VI, Sec. 2, Const. E.L.A.; 1 L.P.R.A. sec. 2.
La Ley de Patentes Municipales es la delegación clara y expresa de la Asamblea Legislativa para que los municipios puedan imponer y cobrar contribuciones, derechos, arbitrios e impuestos razonables dentro de sus límites territoriales y en materias no incompatibles con la tributación impuesta por el Estado. Café Rico Inc. v. Mun. de Mayagüez, supra; F.D.I.C. v. Mun. de San Juan, 134 D.P.R. 385, 391 (1993). Esta autorización responde a la premisa de que los negocios sitos en su territorio se benefician de la organización local para efectuar sus actividades de interés pecuniario y, por tal razón, contribuyen al sostenimiento de la misma. Banco Popular v. Mayagüez, 120 D.P.R. 692,700 (1988). Es importante señalar que este estatuto contributivo dispone los ingresos de individuos, corporaciones o entidades, sobre los cuales se debe imponer el pago de patente municipal. Específicamente, la normativa señala la definición de volumen de negocio:
“7(A)(i) Volumen de Negocios - Significa los ingresos brutos que se reciben o se devenguen por la prestación de cualquier servicio, por la venta de cualquier bien, o por cualquier otra industria o negocio en el municipio donde la casa principal realiza sus operaciones o los ingresos brutos que se teciban o se devenguen por la casa principal en el municipio donde ésta mantenga oficinas, almacenes, sucursales, planta de manufactura, envase, embotellado, procesamiento, elaboración, confección, ensamblaje, extracción, lugar de construcción o cualquier otro tipo de organización, industria o negocio para realizar negocios a su nombre, sin tener en cuenta sus ganancias o beneficios.” See. 2, Ley de Patentes Municipales, Ley 113 del 10 de julio del 1974, según enmendada; 21 L.P.R.A. sec. 651a 7(A) (i).
Para clarificar el concepto de Volumen de Negocio, la Ley de Patentes Municipales define lo que constituye un ingreso bruto al exponer que éste significa la totalidad de los ingresos de fuentes dentro y fuera de Puerto Rico que sean atribuibles a la operación que se lleva a cabo en cada municipio, excluyendo todos los ingresos, tales como interés y dividendos provenientes de la inversión por un individuo de sus propios fondos, de la posesión de acciones corporativas u otros instrumentos de inversión. Ley 113 del 10 de julio del 1974, según enmendada, supra', 21 L.P.R.A. sec. 651a 7 (A) (ii). La definición de este término en la normativa contributiva estatal no es tan clara.
A pesar de la deferencia conferida a los municipios para generar sus ingresos fiscales, se debe reconocer que la legislación contributiva estatal tiene primacía sobre la normativa contributiva municipal. Esto implica que cuando se susciten diferencias entre la Ley de Patentes Municipales y la legislación contributiva estatal, esta última será la que prevalecerá. A través de toda la Ley de Municipios Autónomos se alude y valida esta *1139 consideración. Veamos algunos ejemplos:

“b(4). Los municipios quedan investidos de la autoridad para imponer contribuciones en aquellos asuntos en que el Gobierno Central no tenga el campo ocupado de conformidad con el Artículo 2.002 de esta Ley. El Gobierno Central adoptará un sistema contributivo en armonía con el sistema contributiva municipal. Art. 1.006, inciso b(4), supra; 21 L.P.R.A. see. 4004 b (4).

d. Imponer y cobrar contribuciones, derechos, licencias, arbitrios de construcción y otros arbitrios e impuestos tasas y tarifas razonables dentro de los límites territoriales del municipio, compatible con el Código de Rentas Internas y las leyes del Estado Libre Asociado de Puerto Rico. ” Art. 2.002, inciso d, supra; 21 L.P.R. A. see. 4052 d.
El sistema tributario del gobierno está codificado en un sólo cuerpo jurídico fiscal. En el mismo, está compilada toda la legislación tributaria del país. Las normativas contributivas importantes para esta controversia son: el Código de Rentas Internas, Ley 109 de 26 de septiembre del 1994, según enmendada; la Ley de Incentivos Contributivos, Ley 135 de 2 de diciembre de 1997, según enmendada, y los decretos de exención contributivas que se originan a partir de esta última.
El Código de Rentas Internas define el concepto de ingreso bruto de forma más amplia que la Ley de Patentes Municipales. Específicamente dispone que en el caso de una corporación o sociedad extranjera, el ingreso bruto incluirá: (1) el ingreso bruto que sea derivado de fuentes dentro de Puerto Rico, y (2) el ingreso bruto que esté realmente relacionado con la explotación de una industria o negocio en Puerto Rico. Código de Rentas Internas, Ley 109 de 26 de septiembre del 1994, según enmendada; 13 L.P.R.A. see. 8615 (c).
Para aclarar los conceptos, el Código diferencia lo que constituye un ingreso de fuera y dentro de Puerto Rico. El ingreso bruto de fuentes en Puerto Rico incluye: (1) los intereses sobre bonos, pagarés u otras obligaciones que devenguen intereses, de personas residentes, naturales o jurídicas... Código de Rentas Internas, supra; 13 L.P.R.A. see. 8523 (a) (1). Mientras, el ingreso de fuera de Puerto Rico se configura con los intereses que no sean los derivados de fuentes dentro de Puerto Rico. Código de Rentas Internas, supra; 13 L.P. R.A. see. 8523 (c).
Respecto a este último tipo de ingreso, el Código plantea que exceptuando los párrafos (B) y (C) de la cláusula, ningún ingreso, ganancia o pérdida de fuentes fuera de Puerto Ric'o, se considerará como ingreso realmente relacionado con la explotación de una industria o negocio en Puerto Rico. Código de Rentas Internas, supra; 13 L.P.R.A. see. 8523 (f) (3) (A). En ese sentido, para que el ingreso, la ganancia o pérdida de fuentes fuera de Puerto Rico sea tratado como ingreso realmente relacionado con la explotación de una industria o negocio dentro de Puerto Rico por un individuo no residente o por una corporación o sociedad extranjera, esta persona: (1) debe tener una oficina u otro local fijo de negocios dentro de Puerto Rico al cual dicho ingreso, ganancia o pérdida le es atribuible; y (ii) consiste de dividendos o intereses, o ganancia o pérdida de la venta o permuta de acciones o pagarés, bonos u otras evidencias de deudas y es derivada de la explotación activa de un negocio bancario o financiero o negocio similar dentro de Puerto Rico, o es recibida por una corporación cuyo negocio principal sea el traficar en acciones o valores por cuenta propia. Código de Rentas Internas, supra; 13 L.P.R.A. see. 8523 (f) (3) (B) (ii). Si finalmente se determina que una corporación extranjera tributa bajo estos escenarios, cualquier ingreso de fuentes fuera de Puerto Rico que sea atribuible a sus negocios en Puerto Rico se considerará como realmente relacionado con la dedicación a una industria o negocio dentro de Puerto Rico. Código de Rentas Internas, supra; 13 L.P.R.A. see. 8523 (f) (3) (C).
En resumen, la regla general es que sólo los ingresos por intereses provenientes de Puerto Rico son considerados parte del ingreso bruto tributable. Sin embargo, el análisis no debe limitarse a esa consideración. Si el ingreso por interés proviene de fuera de Puerto Rico es menester realizar un doble análisis para determinar *1140 si éste puede o no formar parte del ingreso bruto tributable. Este análisis incluye los siguientes pasos: (1) identificar si ese ingreso está relacionado con la explotación de una industria o negocio en Puerto Rico; y (2) examinar si el individuo no residente o la corporación extranjera que provee el ingreso tiene una oficina u otro local fijo de negocios dentro de Puerto Rico al cual dicho ingreso le sea atribuible y consiste de dividendos o intereses, entre otros. Al realizar el análisis es importante tener presente que cuando una definición de ingreso bruto en una ley, por la que el Estado ejerce su facultad de imponer tributos, no excluye otras fuentes en ésta no especificadas, debe recibir una amplia y generosa interpretación que dé cumplimiento al propósito legislativo de ejercer con plenitud esa facultad. R.E. Bernier y J.A. Cuevas Segarra, supra, págs. 466-467. Esto implica que ante la intención del gobierno de imponer tributo, habrá que pagar por toda aquella partida que no haya sido excluida por la definición de ingreso bruto.
Por su parte, la Ley de Incentivos Contributivos del 1998 define otros conceptos importantes para determinar si una corporación extranjera, que efectúa negocios en Puerto Rico, está exenta total o parcialmente del pago de contribuciones, y en este caso en particular del pago de patentes municipales. Concretamente, esta ley aclara dos interrogantes: ¿Qué constituye un negocio exento?; ¿Qué compone un ingreso de fomento industrial? El análisis de esta legislación se hará de forma consecuente con la evaluación de los Decretos de PPI y PPL porque están estrechamente relacionados.
Un negocio exento es aquel establecido o que será establecido en Puerto Rico por una persona natural o jurídica, o combinación de ellas (sic) (éstas), organizado bajo un nombre común o no, al que se le ha concedido un decreto de exención contributiva bajo las disposiciones de esta parte o bajo leyes similares anteriores, pero excluyendo hoteles, paradores y otras facilidades especiales, las cuales son negocios exentos bajo leyes anteriores. See. 2, Ley de Incentivos Contributivos, Ley 135 de 2 de diciembre de 1997, según enmendada; 13 L.P.R.A. sec. 10101 (c). Para que un negocio exento pueda plantear que su ingreso cualifica como uno de fomento industrial, el mismo debe haberse obtenido de cualquiera de las siguientes formas: (1) de la operación declarada exenta de esta parte; (2) de las actividades de inversión elegibles descritas en el inciso (j) de esta sección; (3) por concepto de la venta de patentes, regalías...; (4) como resultado del cambio de moneda...; (5) de la distribución de dividendos o beneficios por una corporación o sociedad que es integrante de un negocio exento...; y (6) de pólizas de seguros por interrupción de negocio... See. 2, Ley de Incentivos Contributivos, supra; 13 L.P.R.A. sec. 10101 (a) (1-6). Los tipos de ingreso de fomento industrial pertinentes a este caso son los incluidos en los Incisos (1) y (2).
Indiscutiblemente, un ingreso por interés de un préstamo otorgado por PPI y PPL a su compañía matriz y a una afiliada de Dublin en Irlanda no puede constituir un ingreso de fomento industrial bajo la premisa numero uno. Es decir, un ingreso de interés por un préstamo no cae bajo la operación declarada exenta en el Decreto. El Gobierno de Puerto Rico, a través de su Compañía de Desarrollo Industrial, le otorgó un decreto de exención contributiva a PPI y PPI para la producción y venta de drogas, no para la movilidad conveniente de su capital, como son la otorgación de préstamos y el recibo de sus intereses tanto a su compañía matriz como a otra afiliada. Estas transacciones y beneficios, como son el ingreso de interés por préstamo, tampoco cualifican como una actividad de inversión elegible amparada por la Ley. Veamos qué constituyen las actividades de inversión elegibles.
La Ley de Incentivos Contributivos establece que los ingresos de actividades elegibles son los siguientes: (1) los intereses y dividendos sobre fondos elegibles invertidos por el negocio exento en: (A) Obligaciones emitidas o garantizadas por el Gobierno de Puerto Rico; (B) Préstamos para el financiamiento de construcción, adquisición o mejoras de vivienda en Puerto Rico; (C) Préstamos para la construcción, expansión o adquisición de edificios o terrenos; (D) Préstamos para adquisición de propiedad intangible a ser utilizada por negocios exentos en sus operaciones en Puerto Rico; (E) Obligaciones emitidas por el Fideicomiso de Conservación de Puerto Rico y por el Fideicomiso de Vivienda y Desarrollo Humano de Puerto Rico; (F) Obligaciones de capital o acciones preferidas; (G) Obligaciones emitidas por cualquier subsidiaria de los Farm Credit Banks of *1141 Baltimore o de su sucesor el AgFirst Farm Credit Bank; (H) Préstamos para el financiamiento de operaciones marítimas; (I) Préstamos hechos a Corporaciones Especiales Propiedad de Trabajadores; (J) Acciones de corporaciones o participaciones en sociedades que sean dueñas u operen negocios turísticos exentos; (K) Acciones de corporaciones o participaciones en sociedades que se establezcan como Fondo de Capital de Inversión; (L) Cualesquiera otras obligaciones o préstamos que designe el Comisionado con la aprobación de los miembros del sector público de la Junta Financiera y del Administrador; (M) Notas, pagarés, bonos o cualquier otra evidencia de deuda emitida por el Fideicomiso para Ciencia, Tecnología e Investigación de Puerto Rico, y (2) los intereses sobre fondos elegibles depositados o invertidos por el negocio exento en instituciones dedicadas al negocio bancario, asociaciones de ahorro y préstamos. See. 2, Ley de Incentivos Contributivos, supra; 13 L.P.R.A. sec. 10101 (j) (1) (A-M) (2). La lógica detrás de estas actividades elegibles es que las mismas beneficien directa o indirectamente la economía de Puerto Rico. Las actividades reclamadas por PPI y PPL no cumplen con este objetivo.
Es importante señalar que si el ingreso de interés de PPI y PPL proviene de la producción y venta de drogas, operación declarada exenta por el Decreto, el mismo será exento del pago de patentes municipales en un 60%. Por el contrario, si el ingreso por interés de PPI y PPL es producto de las actividades elegibles, éste estará exento en un 100%. Así está validado en el Decreto. Veamos su texto:
"Be it further decreed, that the granteed shall be 60% exempt from municipal license taxes, municipal excise taxes, and other municipal taxes; provided the granteed’s and PPI’s income from investment in elegible activities under section 2(j) of Act No. 8 or Section 2 (j) of the Act shall be totally exempt from municipal taxes as provided in Section 2(j)(3) of Act No. 8 and Section 2(j)(3) of the Act:" Anejo XIII, párrafo 3, p. 4 (p. Ill del Apéndice).
También, la Ley de Incentivos Contributivos del 1998 es cónsona con esta apreciación. La misma dispone que los negocios exentos que posean un decreto otorgado bajo esta parte disfrutarán de un 60% de exención sobre las patentes municipales, arbitrios municipales, y otras contribuciones municipales impuestas por cualquier ordenanza municipal... See. 2, Ley de Incentivos Contributivos, supra; 13 L.P.R.A. see. 10105 (b) (1).
Como el ingreso de interés por préstamos que realizara PPI y PPL no proviene de la producción y venta de drogas, ni procede de una actividad elegible, éste es totalmente tributable. No le es aplicable ni la exención del 60% y mucho menos la exención del 100%. Esta premisa se valida aún más con las expresiones del Decreto, el cual expone que los préstamos entre PPL y PPI con su entidad matriz Pfizer no están exentos de tributación porque los mismos no fueron realizados por dos "non resident person." Si bien, PPL y PPI son corporaciones foráneas que hacen negocios en Puerto Rico, Pfizer es una corporación foránea que no está autorizada a hacer negocios en Puerto Rico. Específicamente, el texto del decreto dispone que:
“...any royalty, license or similar payment made by a non-resident person to any other non-resident person shall not be subject to tax; provided, that the term "non resident person" shall refer to a corporation or partnership organized under the laws of a jurisdiction other than Puerto Rico that is not engaged in the active conduct of a trade or business in Puerto Rico; and provided, that no tax shall apply to any payment of dividends or distributions made by the grantee to its stockholders, partners, members or owners. ” Decreto de Exención, Anejo XIII, párrafo 7, p. 3 (p. 110, del Apéndice).
El decreto de PPL garantiza una exención por 15 años para ser disfrutada en las instalaciones del municipio de Barceloneta, Puerto Rico. Su efectividad se distribuye de la siguiente forma: (1) contribución sobre ingresos, a partir del 28 de enero de 2000; (2) patentes municipales, desde el 1 de julio de 2000; y (3) impuestos de propiedad, a partir del 1 de enero de 2001. Anejo XIII, párrafo 6, pág. 1 (pág. 108 del Apéndice). Este decreto posibilitó que PPL y PPI entregaran (surrender) un decreto anterior disfrutado por PPI y aprobado *1142 bajo Caso Número 88-8-1-98, efectivo el 27 de enero de 2000 [3] para efectos de la contribución sobre ingresos; el 30 de junio de 2000 para el pago de las patentes municipales y el 31 de diciembre de 2000 para propósitos del pago de contribuciones sobre la propiedad. Anejo XIII, párrafo 7, pág. 1 (pág. 108 del Apéndice). Es importante señalar que el día en que se hizo efectiva la fusión entre PPI y Warner-Lambert Inc. (WLI), este decreto (surrender) conocido como W-L Grant se debe considerar revocado. Anejo XIII, párrafo 4, p. 10 (p. 117).
De acuerdo al decreto, PPL debe ser tratado como una corporación extranjera que hace negocios en Puerto Rico. Anejo XIII, párrafo 6, p. 2 (p. 109 del Apéndice). Mientras, PPI, Pfizer Pharmaceuticals Jersey Limited (CFC) y C. P. Pharmaceuticals Internationals C. V. (CV) deben ser tratados como corporaciones foráneas que no están haciendo negocios en Puerto Rico. Este planteamiento, respecto a PPI, es contrario a lo expuesto en las determinaciones de hechos del Tribunal de Instancia. Anejo XIII, párrafo 6, p. 2 (p. 109). También, se establece en el decreto que Pfizer Inc. tiene la opción (o W-L Grant), en cualquier momento durante la efectividad del decreto, de incluir dentro del decreto de WLI y Parke-Davis Pharmaceutical Limited (PDPL) a las compañías que están exentas bajo el Caso 98-135-1-100. Anejo XIII, párrafo 4, p. 6 (p. 113). No existe en el expediente evidencia de que Pfizer, Inc. pusiera en práctica esta opción. Si lo hubiera hecho, la compañía hubiera tenido la responsabilidad de aumentar el monto de la inversión tri-anual, el número de empleados y cambiaría su estatus contributivo para efectos de Puerto Rico.
Además, el decreto señala que las compañías exentas que se benefician de éste pueden excluir de su ingreso bruto, entradas y ganancias y volumen de negocio que pueden ser adjudicadas a una de las afiliadas que están cubiertas por el decreto. Esto bajo cualquier cláusula del Código de Rentas Internas. Ese ingreso o volumen de negocio excluido no puede ser sometido a impuestos municipales y estatales. La transacción realizada por PPL y PPI fue con Pfizer Inc y una de las afiliadas a Pfizer. Ninguna de éstas es parte del decreto y por lo tanto no están exentas. Anejo XIII, párrafo 8, p. 11 (p. 118).
Debemos examinar los siguientes cuestionamientos: ¿Qué es un Decreto?; ¿Puede un Decreto estar por encima de la Ley que posibilitó su existencia?. Veamos.
Un decreto es un tipo de contrato efectuado entre el Gobierno de Puerto Rico y una corporación extranjera que realiza negocios en Puerto Rico. Esta premisa está validada en la Ley de Incentivo Contributivo del 1998, la cual dispone que las concesiones de exención contributiva se considerarán de la naturaleza de un contrato entre el concesionario, sus accionistas, socios o dueños y el Gobierno de Puerto Rico, e incluirán aquellos términos y condiciones que sean consistentes con el propósito de esta parte y que promuevan la creación de empleos mediante el desarrollo social y económico de Puerto Rico, tomándose en consideración la naturaleza de la petición o acción solicitada, así como los hechos y circunstancias relacionadas de cada caso en particular que puedan ser de aplicación. Sec. 13, Ley de Incentivos Contributivos, supra; 13 L.P.R.A. see. 10112 (f). También, en el Decreto se hace referencia a que el mismo es un contrato. Anejo XIII, párrafo 2, p. 5 (p. 112).
El decreto es un contrato al cual le aplica toda la normativa jurídica contractual que ha definido nuestro más alto foro. A continuación se hace referencia a dicha normativa.
En Puerto Rico rige el principio de la libertad de contratación, según el cual las partes contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que las mismas no sean contrarias a las leyes, a la moral ni al orden público. Art. 1207 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 3372; S.L.G. Irizarry v. S.L.G. García, 155 D.P.R. 713, 725 (2001); Trinidad v. Chade, 153 D.P.R. 280, 289 (2001); Arthur Young & Co. v. Vega III, 136 D.P.R. 157, 170 (1994). Una vez queda perfeccionado un contrato, las partes quedan obligadas al cumplimiento de lo expresamente pactado y a las consecuencias que se deriven del mismo, ello conforme a la buena fe, al uso y a la ley. Art. 1210 del Código Civil de P.R., 31 L.P.R. A. see. 3375; Trinidad v. Chade, supra, pág 289. De esta manera, cuando un contrato es legal, válido y carente de vicios del consentimiento, el mismo constituye la ley entre las partes y debe cumplirse a tenor del mismo. *1143 Artículo 1044 del Código Civil, 31 L.P.R.A. see. 2994; Constructora Bauzá, Inc. v. García López; 129 D.P.R. 579, 593 (1991). Por esto, el Código Civil sujeta, a aquellos que de alguna manera contravengan sus obligaciones, a la indemnización de los daños y perjuicios causados. Artículo 1054 del Código Civil, 31 L.P.R. A. see. 3018. Bajo este supuesto, todo incumplimiento contractual dará lugar aun resarcimiento.
Toda esta normativa contractual es clara. Un contrato para ser válido, no puede estar por encima de la ley, la moral ni el orden público. Esta apreciación le es aplicable a los decretos, ya que éstos son contratos. En ese sentido, el Decreto de PPI y PPL no debe ser incongruente con la Ley de Incentivos Contributivos del 1998, que fue la que posibilitó su existencia. Tal planteamiento está validado en el decreto cuando se establece que la exención contributiva concedida tiene que estar de acuerdo a los términos que establece la Ley de Incentivos Contributivos del 1998. Concretamente, el Decreto expone que:
“Now, Therefore, be it Decreed by the Secretary of State of Puerto Rico, that the applicants, Warner-Lamber Inc. and Parlce-Davis Pharmaceuticals Limited, (jointly "WLI & PDPL" and hereinafter referred to collectively as the "Grantees") be hereby granted tax exemption in accordance with the applicable terms of the 1998 Act, covering the production and sale of: (i) any and all prescription pharmaceutical and biological products and non-prescription pharmaceutical and health care products... ”. Anejo XII, párrafo 4, pág. 1 (pág. 96 del Apéndice).
En conclusión, el ingreso por intereses de un préstamo que PPL o PPI otorgaron a su compañía matriz y a una afiliada en Irlanda no constituye un ingreso de fomento industrial y no está comprendida bajo la operación declarada exenta en el Decreto. Tampoco cualifican como una operación de inversión elegible bajo los parámetros de la ley.
IV
El juicio de novo y la revisión judicial
En el ámbito administrativo, el juicio de novo sólo procede cuando la ley orgánica o habilitadora de la agencia lo dispone expresamente. Demetrio Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, Segunda Edición Revisada, Forum-Legis Editores S.A., Bogotá, D.C.Colombia, 2002, pág. 581; Dávila v. E.L.A., 128 D.P.R. 419, 426 (1991). En el juicio de novo, la parte afectada por la decisión administrativa tiene derecho a litigar nuevamente el asunto mediante la presentación de prueba pertinente, inclusive prueba que no fue incluida durante el trámite administrativo, en apoyo de sus respectivas posiciones. El Tribunal de Primera Instancia llegará a su propia determinación basándose en dicha evidencia. Granados v. Rodríguez Estrada I, 124 D.P.R. 1, 19 (1989). Esto significa que el tribunal revisor no está atado por las determinaciones y conclusiones de la agencia. Por lo que puede sustituir las apreciaciones y recomendaciones del ente administrativo con las suyas propias.
Por otra parte, la revisión judicial de las determinaciones administrativas se ha convertido en un instrumento necesario para evitar las actuaciones arbitrarias y velar por el estricto cumplimiento con el debido proceso de ley. Esta premisa ha sido enfatizada por el Tribunal Supremo de Puerto Rico al expresar lo siguiente: “hemos sido renuentes ha aceptar ausencia de jurisdicción de los tribunales, excepto en aquellos casos en los que el legislador claramente así lo ha dispuesto..., pues la facultad de resolver casos y controversias tiene su origen en la disposición constitucional que establece el poder judicial". Mun. Arecibo v. Mun. Quebradilla, 161 D.P.R. 109, 117-119(2004).
Los tribunales tienen una función de supervisión, encaminada a proteger a las personas de actuaciones ultra vires, inconstitucionales y arbitrarias de las agencias. Vélez v. ARPE, 2006 J.T.S. 78, 167 D.P.R._(2006). Al realizar esta función, los tribunales apelativos han de conceder gran consideración y deferencia a las decisiones administrativas por razón de su experiencia y conocimiento especializado, por lo que la revisión judicial es algo *1144 restringida o limitada. Hernández v. Centro Unido, 2006 J.T.S. 140, 168 D.P.R._(2006); Vélez v. ARPE, supra; Martínez v. Rosado, 2005 J.T.S. 132, 165 D.P.R. _, (2005). Esto para evitar que el criterio del organismo especializado sea sustituido por el criterio del tribunal revisor. Vélez v. ARPE, supra.
Es importante recalcar que la revisión judicial estatutaria definida y establecida a través de la Ley de Procedimiento Administrativo Uniforme, Ley 170 del 12 de agosto del 1988, según enmendada, no le es aplicable a los municipios. Esta ley claramente dispone que todos los organismos gubernamentales, o funcionarios, autorizados a: (1) reglamentar; (2) investigar; (3) acusar o adjudicar, están incluidos en la definición de agencias a las cuales le es extensible el estatuto. Sin embargo, esta normativa expresamente exceptúa de su aplicación a: (1) la Asamblea Legislativa; (2) la Rama Judicial; (3) la Oficina del Gobernador y sus agencias satélites; (4) la Guardia Nacional; (5) los gobiernos municipales o sus entidades o corporaciones; (6) la Comisión Estatal de Elecciones; (7) el Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos; (8) la Junta Asesora del Departamento de Asuntos del Consumidor sobre el Sistema de Clasificación de Programas de Televisión y Juguetes Peligrosos; y (9) la Comisión para Resolver Controversias sobre Pagos y Deudas entre Agencias Gubernamentales. Sec. 1.3 (a), Ley de Procedimiento Administrativo Uniforme, Ley 170 del 12 de agosto del 1998; 3 L.P.R.A. see. 2102.
Sin embargo, la revisión judicial de las determinaciones administrativas de los municipios es conferida por la Ley de la Judicatura de 2003. Este estatuto expone que el Tribunal de Apelaciones conocerá, mediante recurso de revisión judicial, que se acogerá como cuestión de derecho, las decisiones, órdenes y resoluciones finales de los organismos o agencias administrativas. Art. 4.006, Ley de la Judicatura de 2003; 4 L.P.R.A. see. 22k(g). También, los municipios pueden establecer la revisión judicial a través de sus disposiciones estatutarias o porque el administrador, en el ejercicio del poder de adjudicación, haya puesto en vigor todas aquellas garantías procesales que la propicien, pese al silencio que sobre este extremo guardan sus estatutos. Demetrio Fernández Quiñones, supra, pág. 581.
La Ley de Municipios Autónomos, en sus disposiciones, establece la jurisdicción de los Tribunales de Justicia del Estado Libre Asociado, específicamente del Tribunal de Primera Instancia y del Tribunal Apelativo. Art. 15.002, Ley de Municipios Autónomos, supra; 21 L.P.R.A. see. 4702. No obstante, no aclara si las penalidades, por no someter los Estados Financieros Auditados conjuntamente con la Declaración de Volumen de Negocio, pueden ser cuestionadas a través de un juicio de novo o revisión judicial ante el tribunal. El estatuto sólo manifiesta que el Tribunal de Primera Instancia revisará cualquier acto legislativo o administrativo de cualquier funcionario u organismo municipal que lesione derechos constitucionales de los querellantes o que sea contrario a las leyes de Puerto Rico. Art. 15.002, Ley de Municipios Autónomos, supra. Esta premisa es claramente distinguible de la controversia que está ante la consideración de este foro apelativo.
Tampoco la Ley de Patentes Municipales plantea si este tipo de penalidades son apelables a través de la revisión judicial o por medio de un juicio de novo. La normativa sólo alude a lo siguiente:
“En el caso que se dejare de rendir cualquier declaración requerida por las sees. 651 a 652 y de este título dentro del término prescrito por ley o por el Director de Finanzas de conformidad con la ley, a menos que se demuestre que tal omisión se debe a causa razonable y que no se debe a descuido voluntario, se adicionará a la patente: 5% si la omisión es por no más de 30 días y 5% adicional por cada período o fracción de período adicional de 30 días mientras subsista la omisión, sin que se exceda de 25% en total. La cantidad así adicionada a cualquier patente será cobrada al mismo tiempo y en la misma forma y como parte de la patente, a menos que ésta haya sido pagada con anterioridad al descubrimiento de la omisión, en cuyo caso la cantidad así adicionada será cobrada en la misma forma que la patente. ” Ley de Patentes Municipales; supra; 21 L.P.R. A. see. 65lu.
La notificación por deficiencia en el pago de patentes municipales es la única instancia donde se especifica *1145 el mecanismo jurídico procesal que se tiene que utilizar para cuestionarla. Sobre el particular, la ley dispone que:
“Si en el caso de cualquier persona el Director de Finanzas determinare que hay una deficiencia con respecto a la patente impuesta por autorización de las sees. 651 a 652y de este título, el Director de Finanzas notificará a la persona dicha deficiencia por correo certificado, y la persona podrá, dentro de los 30 días siguientes a la fecha del depósito en el correo de dicha notificación o dentro de la prórroga que a tal fin le concede el Director de Finanzas, solicitar de éste, por escrito, la reconsideración de dicha deficiencia o pedir una vista administrativa en relación con la misma. Si la persona no solicitare reconsideración en la forma y dentro del término aquí dispuesto, o si habiéndola solicitado, se confirmare en todo o en parte la deficiencia notificada, el Director de Finanzas notificará por correo certificado, en ambos casos, su determinación final a la persona con expresión del monto de la fianza que deberá prestar la persona si deseare recurrir ante el Tribunal de Primera Instancia contra dicha determinación de deficiencia. Tal fianza no debe exceder del monto de la patente, más intereses sobre la deficiencia computados por el período de un año adicional al 9% anual. ” Ley de Patentes Municipales; supra; 21 L.P.R.A. sec. 651o (a) (1).
Las disposiciones estatutarias, pertinentes a este caso, no especifican si ante una penalidad por no rendir Estados Financieros Auditados, lo que provoca que se tenga por no entregada la Declaración de Volumen de Negocios, se debe recurrir al mecanismo de la revisión judicial o a un juicio de novo. Tampoco del expediente del caso se puede apreciar si el Municipio mantenía un procedimiento interno constitutivo de una revisión judicial. Ante esta ausencia de información es procedente acudir a las reglas de hermenéutica legal.
Toda interpretación estatutaria debe estar orientada a determinar el significado del estatuto a base del análisis global y en conjunto de todas sus disposiciones. Este principio posibilita el logro de dos objetivos: (1) aclarar las ambigüedades, y (2) hacer la ley armónica y efectiva. La idea es examinar toda la ley y comparar todas sus partes, de forma que éstas sean consistentes y puedan tener efecto práctico y legal. Para esto, deben interpretarse las diferentes secciones, las unas en relación con las otras, completando o supliendo lo que falte o sea oscuro en una con lo dispuesto en la otra, procurando siempre dar cumplimiento al propósito del legislador. Orta v. Registrador, 60 D.P.R. 789 793 (1942); R.E. Bernier y J.A. Cuevas Segarra, supra, pág. 315. Es medular comprender que no se puede interpretar una parte de la ley porque se frustrarían los propósitos del estatuto que pueden ser percibidos de su lectura integral. Para interpretar correctamente una ley debe buscarse la intención legislativa, no en una frase aislada o en una de sus secciones, sino en el contexto de todo el estatuto, tomando en cuenta el propósito perseguido por el legislador. Pueblo v. De Jesús, 70 D.P.R. 27, 42 (1949).
Las reglas de hermenéuticas también aplican cuando un precepto es susceptible a dos o más interpretaciones razonables. En ese caso, se debe seguir la intención del legislador y seleccionar aquella interpretación que: (1) evite entrar a considerar cuestiones constitucionales, si es posible, y de ser viable, acoger la interpretación que sea cónsona con la validez de la ley, o sea, que mantenga su constitucionalidad; (2) tenga el efecto de armonizar dos secciones aparentemente en conflicto; (3) evite un discrimen; (4) rechace la posible interpretación que conduce al absurdo y prefiera la más racional, desde el punto de vista de la finalidad de la ley; (5) tenga un resultado sensato y en sentido tal que no equivalga a exigir cosas inútiles o vanas; y (6) no cierre las puertas de los tribunales a un litigante. R. E. Bernier y J. A. Cuevas Segarra, supra, págs. 487-492.
Al analizar en su totalidad la Ley de Patentes Municipales llegamos a las siguientes conclusiones: (1) las disposiciones del estatuto no hacen referencia a si las penalidades deben ser apeladas mediante revisión judicial o juicio de novo; (2) la imposición de penalidades y la notificación de deficiencias por pago de patente municipales son ambas determinaciones administrativas; (3) la notificación de deficiencias es la única instancia donde se hace alusión a la aplicación del juicio de novo; (4) la finalidad de que las notificaciones de deficiencias sean cuestionadas, a través de una demanda de impugnación y juicio de novo, es que no se le imponga más dinero que el dispuesto en la ley a los contribuyentes por el pago de las patentes municipales; (5) la disposición *1146 relativa a las penalidades provea la opción para establecer que existe causa razonable para la omisión; (6) el no estar de acuerdo con una deficiencia en el pago de patente provoca el trámite administrativo interno en el Municipio, la demanda de impugnación y el juicio de novo en contra del criterio del Director de Finanzas del Municipio; (7) de forma similar, la causa razonable es el detonador para establecer que el Municipio se equivocó al imponer la penalidad.
En el caso ante nos, tanto la deficiencia como la penalidad son producto de los incumplimientos del contribuyente o de la evaluación equivocada del Director de Finanzas del Municipio. Ambas determinaciones deben tener la opción de ser cuestionadas ante un foro imparcial, distinto al Municipio. No es lógico pensar que ante dos determinaciones administrativas, en esencia similares, el legislador optara porque las deficiencias fueran cuestionadas mediante el juicio de novo; mientras las penalidades sólo se apelaran mediante revisión judicial. Mantener esta contradicción sólo validaría que el Director de Finanzas tuviera la potestad absoluta para investigar, acusar y adjudicar los casos de penalidades. Esta no puede ser la intensión legislativa del estatuto.
Concluimos, por lo tanto, que el recurso apropiado para ventilar las controversia sobre los señalamientos de deficiencias y penalidades lo es el juicio de novo ante el Tribunal de Instancia.
Y
La mayoría de los planteamientos del Municipio están dirigidos a cuestionar la apreciación de la prueba que realizó el Tribunal de Instancia. En esencia, el Municipio sólo ha presentado dos controversias de derecho. Lo contradictorio de esta acción es que el Municipio no ha puesto a este foro apelativo en condiciones de ejercer nuestra función revisora, al no presentar un resumen de la prueba desfilada ante el Tribunal de Instancia. A continuación, algunos de los planteamientos del Municipio que fueron cuestionados por PPL y PPI.
Respecto a los $43,831,465 de reembolso que PPI recibió por la cantidad aportada para el mercadeo de sus productos, y que su existencia fue avalada en las determinaciones de hechos del foro de instancia, el Municipio plantea que en instancia no se presentó evidencia documental o testifical de un testigo con conocimiento personal del acuerdo sobre los adelantos para mercadeo y publicidad. En ese sentido, plantea el Municipio que la información contenida en las facturas "Intercompany Credit Invoices" no pudo ser corroborada por evidencia independiente, ni se verificó la exactitud de las mismas. Por su parte, PPI y PPL argumentan que el tribunal basó la existencia de la inversión de $80,167,444 para los gastos anuales en mercadear sus productos y el consecuente reembolso, en los testimonios de la señora Ana Iris Agosto Zayas y del auditor externo de Pfizer, CPA José R. Lugo, así como en los documentos en autos y los sometidos en evidencia.
También, el Municipio indica que las declaraciones juradas del señor Dorien Santos y la señora Ana Agosto no fueron admitidas en el caso y que, sin embargo, fueron incorporadas en el texto de la sentencia del Tribunal de Instancia. De acuerdo al Municipio, estas dos declaraciones fueron las únicas que se utilizaron para establecer la justa causa para la demora de PPI y PPL para presentar los informes financieros auditados. Por su parte, PPI y PPL plantean que los testimonios de la señora Agosto y el señor Lugo, a los cuales el tribunal de instancia les otorgó entero crédito, declararon todos los hechos sostenidos en las referidas declaraciones juradas. El señalamiento tiene que ver con la credibilidad de los testigos presentados ante el Tribunal de Instancia durante el juicio. El Tribunal adjudicó la credibilidad y no tenemos la transcripción de juicio o cualquier otro medio de reproducción de prueba. No podemos llegar a otra conclusión en ausencia de error, prejuicio o ilegalidad.
El Tribunal Supremo ha sido enfático en establecer que el foro de instancia se encuentra en una posición privilegiada para evaluar la prueba testifical y determinar el grado de credibilidad que le debe conferir. En ese sentido, el foro apelativo no intervendrá con la apreciación de la prueba que realizara el tribunal de instancia, a menos que exista pasión, prejuicio, parcialidad o error manifiesto. Esta actuación representa una deferencia judicial al foro que tiene la gran responsabilidad de recibir y aquilatar la prueba.
*1147 Por otro lado, una corporación extranjera es considerada un negocio exento si realiza negocios en Puerto Rico y se le ha concedido un decreto de exención contributiva. De ordinario, el ingreso bruto para fines contributivos sólo incluye los ingresos por intereses provenientes de Puerto Rico. Sin embargo, el análisis no debe limitarse a esa consideración. Hay que tener presente que si el ingreso por interés proviene de fuera de Puerto Rico se debe realizar un doble análisis: (1) identificar si ese ingreso está relacionado con la explotación de una industria o negocio en Puerto Rico; y (2) examinar si el individuo no residente o la corporación extranjera que provee el ingreso tiene una oficina u otro local fijo de negocios dentro de Puerto Rico al cual dicho ingreso le sea atribuible y consiste de dividendos o intereses, entre otros. Una vez se determine que el ingreso de interés proveniente de fuera de Puerto Rico debe formar parte del ingreso bruto tributable, el mismo no constituye un ingreso de fomento industrial y es tributable en su totalidad.
Para que un negocio exento pueda plantear que su ingreso cualifica como uno de fomento industrial, y de esa forma aplicarle la exención contributiva correspondiente, el mismo debe haberse obtenido de cualquiera de las siguientes formas: (1) de la operación declarada exenta de esta parte; o (2) de las actividades de inversión elegibles que establece la Ley de Incentivos Contributivos del 1998. El ingreso por interés de un préstamo otorgado por PPI y PPL a su compañía matriz y a una afiliada de Dublin en Irlanda no puede constituir un ingreso de fomento industrial. Es decir, un ingreso de interés por un préstamo no cae bajo la operación declarada exenta en el Decreto. El Gobierno de Puerto Rico sólo le otorgó un decreto de exención contributiva a PPI y PPL para la producción y venta de drogas. No para la movilidad conveniente de su capital. Estas transacciones y beneficios, tampoco cualifican como una actividad de inversión elegible amparada por la Ley de Incentivos Contributivos del 1998.
Finalmente, la Ley de Patentes Municipales no dispone cómo una persona o corporación afectada por la imposición de una penalidad puede apelar la determinación del Director de Finanzas del Municipio. La normativa no establece si la persona o el ente jurídico pueden recurrir mediante revisión judicial o a través de un juicio de novo. Sin embargo, en el contexto integral del estatuto, es obligado concluir que el legislador, al establecer que las notificaciones por deficiencias en los pagos de patentes municipales se cuestionan a través de un juicio de novo, hace inclusivo este mecanismo a las penalidades. Una interpretación contraria resultaría en que el Director de Finanzas del Municipio no tan sólo investigara, sino que también adjudicara la controversia, sin proveerle una determinación confiable y objetiva a la persona o entidad afectada.
VI
Por los fundamentos antes expuestos, se revoca la sentencia del Tribunal de Primera Instancia en cuanto a la notificación de las deficiencias en el pago de patentes municipales. Específicamente, se restituye la notificación de deficiencia en el pago de patentes municipales por lo cual PPI y PPL deberán proceder a pagarle al Municipio el 60% de los ingresos por interés que obtuvieron por los préstamos realizados a su compañía matriz y a una afiliada.
Así lo pronunció y manda el Tribunal y lo certifica la Secretaria.
Leda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2008 DTA 55
1. "...production and sale of synthesized drugs for human or animal use in any therapeutic class whether in bulk form or in any dosage form or any intermediates thereof." Sección 11(b)(3), Ley 135, 1997. Decreto de Exención, Anejo XIII, párrafo 3, p. 1 del Decreto.
2. A continuación se discuten algunas de las obligaciones de las corporaciones PPI y PPL dentro del decreto.
*1148 (1) El decreto incluye una Tabla donde se establece el por ciento de impuestos que pagará PPL. El mismo se calcula multiplicando el ingreso de desarrollo industrial (IDI) fijo de la compañía por la tasa de ingreso contributivo que se le asigne entre un mínimo de 2% y un máximo de 4.5%. El porciento dependerá del número de empleados regulares. A mayor el número de empleados menor el porciento de impuestos aplicable: Decreto de Exención, Anejo XIII, párrafo 7, p. 1 y 2 (p. 108-109).
(2) El decreto obliga a PPL a realizar una inversión de capital no menor de $75 millones en o antes de diciembre de 2003. Decreto de Exención, Anejo XIII, párrafo 3, p. 2 (p. 109).
3. Ese decreto se aprobó bajo la Antigua Ley de Exención Contributiva, Ley 8, 1987.